IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


CHARLES D. GREEN,

                    Plaintiff,

          v.                         CASE NO.  09-3055-SAC

CHARLTON D. LAWHORN,
et al.,

                    Defendants.

<u>MEMORANDUM AND ORDER</u>

Plaintiff filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 seeking injunctive relief and money damages.  He named several defendants and raised several claims including that defendants were deliberately indifferent to his serious medical needs while he was in the custody of the Kansas Department of Corrections (KDOC) in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  In prior orders, the court dismissed all claims except that of denial of medical treatment and all defendants except Dr. Charles Lawhorn and Dr. John Satchell. Mr. Green's claims for injunctive relief became moot upon his release from KDOC custody.

This matter is now before the court upon the following:

Doc. 61: Defendant Lawhorn's Motion for Summary Judgment,

Doc. 69: "Plaintiff's Response Opposing Dismissing Dr. Satchell as a Defendant,"

Doc. 69: "Plaintiff's Motion in Opposition to the Dismissal of CCS (Correct Care Solutions) as a Defendant,"

Doc. 70: Plaintiff's Third Motion for Defendants to Comply with Crow's Court Orders of 3/30/10, and

Doc. 74: Plaintiff's Motion to Appoint Counsel.

Having considered these filings, attachments, responses, the Martinez Report and attachments, together with relevant portions of the case file and the applicable legal authority, the court finds that Mr. Green presents no plausible constitutional claim of denial of medical treatment. For this reason, the court sustains defendant Lawhorn's Motion for Summary Judgment and dismisses this action as against Dr. Lawhorn. This action is also dismissed as against defendant Dr. Satchell for lack of timely service and pursuant to the court's continuing statutory duty to screen the complaint for failure to state a claim under to 28 U.S.C. § 1915A(b)(1) and 28 U.S.C. § 1915(e)(2)(B)(ii).[1] Accordingly, this action is dismissed and all relief is denied.

## I.  DEFENDANT LAWHORN'S MOTION FOR SUMMARY JUDGMENT

In determining this motion for summary judgment,[2] the court has also considered Plaintiff's Memorandum in Opposition to Defendants Motion for Summary Judgment (Doc. 68), Defendant Lawhorn's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 71), and Plaintiff's Second Memorandum in Opposition to Defendants Motion for Summary Judgment and to Clarify Facts Already on File (Doc. 73).

### A.  Summary Judgment Standards

---

[1]     Mr. Green was a prisoner when the events alleged in the complaint occurred and when he filed the complaint. Even though he paid the full filing fee upon initiating this lawsuit, he thereafter moved for and was granted leave to proceed in forma pauperis on April 9, 2010 (Doc. 21).

[2]     The court previously converted defendant Lawhorn's motion for judgment on the pleadings to one for summary judgment (Doc. 67), noting that both parties had referred to the medical records attached to the Martinez Report.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), cert. denied, 537 U.S. 816 (2002)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001)(citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In attempting to meet this standard, a movant that "does not bear the ultimate burden of persuasion at trial" need not negate the other party's claim; rather, the movant may simply point out to the court "a lack of evidence for the nonmovant on an essential element of that party's claim." Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000)(citing Adler, 144 F.3d at 670, 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Spaulding, 279 F.3d at 904 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson, 477 U.S. at 256; Celotex, 477 U.S. at 324)). In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on

suspicion." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).
Nor can the nonmoving party simply rest upon its pleadings to
satisfy its burden. Anderson, 477 U.S. at 256; Eck v. Parke, Davis
& Co., 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving
party must "set forth specific facts that would be admissible in
evidence in the event of trial from which a rational trier of fact
could find for the nonmovant." Mitchell v. City of Moore, Okla.,
218 F.3d 1190, 1197-98 (10th Cir. 2000)(quoting Adler, 144 F.3d at
671). To accomplish this, the facts "must be identified by
reference to an affidavit, a deposition transcript, or a specific
exhibit incorporated therein." Adams, 233 F.3d at 1246. The court
views the evidence and all reasonable inferences therefrom in the
light most favorable to the nonmoving party. Finally, summary
judgment is not a disfavored procedural shortcut. On the contrary,
it is an important procedure "designed to secure the just, speedy
and inexpensive determination of every action." Celotex, 477 U.S.
at 327 (quoting Fed.R.Civ.P. 1).


### B.  Plaintiff's Allegations

The court has again reviewed plaintiff's First Amended
Complaint, that is Doc. 1 and Doc. 2 combined, and summarizes the
allegations upon which Mr. Green's claim against Dr. Lawhorn is
based.[3] For several years before Mr. Green was taken into custody
in May 2005, he was prescribed Proscar for benign prostate
hypertrophy (BPH) and Androgel by his personal outside physician,

---

[3]     Mr. Green has made many varying allegations in numerous unsworn
motions and filings, but the court considers only those made in a proper and
complete amended complaint.

Dr. Feder.   Dr. Gamble continued to prescribe Proscar for
plaintiff's BPH at the Johnson County Adult Detention Center
(JCADC) where Green was confined until September 2007.  Plaintiff's
BPH was effectively treated during those years.   Upon being taken
into KDOC custody in September 2007, Mr. Green was again diagnosed
with BPH and arthritis.   Initially, Cardura was prescribed for
immediate treatment of his BPH, and a 90-day prescription for
Proscar was approved.  However, after this initial prescription for
Proscar expired, Mr. Green was not provided Proscar again while in
KDOC custody.  He was never provided Androgel for arthritis while
in KDOC custody.  He was informed that Proscar and Androgel were
"non-formulary" drugs that required special approval from the state
or regional "Medical Director," which apparently was Dr. Lawhorn,
before they could be prescribed.  Mr. Green was seen and/or treated
by several different prison doctors for his conditions.  Most, if
not all, these doctors "ordered" Proscar to treat Mr. Green, but
Dr. Lawhorn refused to grant special approval.  Plaintiff claims,
based upon these allegations, that he was provided no treatment for
his BPH and arthritis while in KDOC custody and that he suffered
deterioration in his conditions and pain as a result.

### C.  Grounds for Motion

In his summary judgment motion, defendant Lawhorn alleges
that substitution of an alternative medication for the previously-
prescribed brand drug Proscar to treat plaintiff's BPH was a
medical judgment made by him.  In addition, Dr. Lawhorn avers that
"the drug AndroGel is a topical hormone used to treat low
testerone," which in his medical judgment was not an appropriate

treatment for plaintiff's arthritis or BPH.  He argues that neither Mr. Green's disagreement with his medical judgment nor a disagreement among medical providers amounts to an Eighth Amendment claim for denial of medical treatment.   He points out that plaintiff's own exhibits and the medical records provided with the Martinez Report show that Mr. Green received medical treatment while in KDOC custody and contradict plaintiff's conclusory allegations that defendant Lawhorn deliberately ignored his conditions, refused him "any effective treatment," and left his conditions entirely untreated.   Defendant Lawhorn thus contends that the allegations in plaintiff's First Amended Complaint, taken as true, fail to state an Eighth Amendment violation and therefore fail to state a claim for relief under § 1983.  On these grounds, he asserts that he is entitled to qualified immunity.  He also asserts that the material facts are not in dispute and that he is entitled to judgment as a matter of law.

### D.  Plaintiff's Opposition to Motion

Mr. Green was notified by the court that in order to oppose this motion, he must file a Memorandum in Opposition, citing D.Kan.Rule 56.1(b), that must "begin with a section containing a concise statement of material facts as to which (he) contends a genuine issue exists;" and that each disputed fact must be numbered and "refer with particularity to those portions of the record upon which (plaintiff) relies."  Memorandum & Order (Doc. 67) at 23-24. He was also specifically directed that each of his "references to the record must include the court's docket number, the title of the filing that contains the part of the record on which he relies, and

the specific page number within that document."  Mr. Green failed to follow these orders.[4]  Nevertheless, the court has considered the arguments and allegations in plaintiff's Memoranda and the Amended Complaint in determining whether or not a material fact is in dispute.

Plaintiff's First Amended Complaint may be treated as an affidavit under Fed.R.Civ.P. 56(e).  Mosier v. Maynard, 937 F.2d 1521, 1524 (10th Cir. 1992).  However, plaintiff makes no specific citation to material factual statements in his Amended Complaint. It is not the court's function to again scour plaintiff's other voluminous filings, many improper or repetitive, for sworn statements based on personal knowledge, which might rebut the defendants' statement of undisputed facts.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).

The court has thoroughly reviewed "Plaintiff's (first) Memorandum in Opposition to Defendants Motion for Summary Judgment" (Doc. 68).  No concise statement of material facts is presented therein as to which Mr. Green contends a genuine issue exists.  Not a single material fact is set forth that is numbered then followed by an explanation as to how it is in dispute together with a reference with particularity to the record showing the dispute. Instead of setting forth specific facts showing a genuine issue for trial, Mr. Green makes general references to his voluminous

---

[4]     These directions were not reproduced in this case to confuse or frustrate Mr. Green.  The court hoped that setting forth explicit directions would allow him to file a proper memorandum that contained his statement of materials facts and how those facts are in dispute.  This format and content are required by local court rule of all parties responding to summary judgment motions.

filings,[5] makes more conclusory statements, repeats old arguments, and attempts to raise new arguments.[6]  He claims that he does not understand the court's instructions, which the court still finds no reason to credit.  He claims that the undersigned judge has "lied again," but offers no facts in support.  He also alleges that he has "offered proof" that defendants' affidavits are untruthful.  However, the sparse facts mentioned in connection with this bald statement are either unclear or irrelevant, such as his allegations relating to his lawsuit against the JCADC.  "'[C]onclusory and self-serving affidavits are not sufficient to establish the existence of a disputed material fact and therefore defeat a motion for summary judgment."  Boles v. Dansdill, 361 Fed.Appx. 15, 18 (10th Cir. 2010)[7](citing Hall v. Bellmon, 935 F.2d 1110, 1111 (10th Cir. 1991)).

Plaintiff filed a Second Memorandum in Opposition to Defendants Motion for Summary Judgment (Doc. 73), despite the

---

[5]     For example, he alleges that the "court file contains all documentation as does the Martinez report to support these facts;" the "facts in this case have been recorded and submitted by the plaintiff as they occurred" since May 2005; and "exhibits are a part of this file and refute the majority of the claims" in defendant's summary judgment motion, "while many more facts contained therein support the plaintiff's position."  As another example, he states that he already filed responses to Lawhorn's motion, citing four documents by number only, and misrepresents that those documents followed the instructions for his memorandum in opposition.  He then states that he has no reason to repeat the information.

[6]     For example, plaintiff argues that Dr. Lawhorn had no authority to deny "orders given by the attending physician" or to make any medical decision in his case because he was an administrator and not an attending physician, and that Lawhorn acted solely to save money, out of anger at Green, and to cause plaintiff embarrassment, pain and suffering.  He also argues that Dr. Lawhorn failed to "provide care equal to prevailing community standards," that his judgment was "so egregiously bad that it really isn't medical;" and that the court must determine what treatment was "legally correct" for plaintiff by considering the "decisions of those doctors" that have treated him since his release.  The documents accompanying his Memorandum in Opposition are mainly proof of treatment that he received after his release.

[7]     Unpublished opinions are not cited herein as binding precedent, but for persuasive value only.  See Fed.R.App.P. 32.1 and 10th Cir.R. 32.1.

court's order that he file only one.  While, the court need not
consider this pleading for this reason, it notes that all but three
paragraphs are duplicates from his First Memorandum.  In two new
paragraphs he again makes only general statements, such as that he
has previously "satisfied all requests made by the court in the
9/19/2011 order" and that he has already filed affidavits in this
case that "are more than enough evidence to send this case to a
jury."  In his other new paragraph, Mr. Green generally claims that
the undersigned judge has made many errors.  He also makes
arguments, repeated in his motion for counsel, that it is
"physically and financially impossible for him to provide
affidavits to support his claims" as he lacks the time, financial
ability, and access to interview jail and prison personnel.
However, Mr. Green had years in prison when he could have asked any
witness for an affidavit.  He also claims that he has "introduced
new evidence that he has severe mental, emotional and psychological
problems," and that he is incompetent to act as his own attorney.
These general allegations do not convince the court that unusual
circumstances now exist or that plaintiff's mental condition
prevented him from obtaining affidavits or other evidence to
support his claims.  The court concludes that neither plaintiff's
Amended Complaint nor his memoranda in opposition competently set
forth any disputed material fact for trial.

## E.   Undisputed Facts

     In its prior Order treating defendant's motion as one for
summary judgment, the court set forth numbered facts found from the
First Amended Complaint and attachments.  Neither party has

disputed any of those facts.  Having now considered all relevant materials properly filed by the parties together with the Martinez Report (MR)(Doc. 53) and attached medical records, the court finds that the following material facts are undisputed.

1.  Mr. Green was taken into KDOC custody on September 26, 2007.  His First Amended Complaint was filed on March 23, 2009. Mr. Green was repeatedly notified that he could not add claims without submitting a complete, proper amended complaint.  No second amended complaint was filed.  Thus, the only claims properly raised in this case arose between September 26, 2007, and March 23, 2009. At all relevant times Mr. Green was a KDOC inmate.

2.  Relevant Prison Health Services records that were submitted with the Martinez Report indicate that in December 2005, while Mr. Green was at the JCADC, he was "still requesting Angrogel for arthritis," and Dr. Gamble explained to him that "this medication is not the standard of care for arthritis."  MR at 18. JCADC records also indicate that Mr. Green complained of frequent dizzy spells and seizures even while he was taking Proscar.  MR at 57.  Those records also indicate prior mental health problems that were treated with psychotropic medications.

3.  Upon KDOC intake, at the Reception and Diagnostic Unit/El Dorado Correctional Facility (RDU) Mr. Green was administered a "battery" of medical tests including x-rays (for arthritis), blood panels and a complete physical, as well as testing regarding his mental condition.  He was placed on Chronic Care.

4.  At the RDU, Mr. Green immediately began submitting writings addressed to "doctor and medical staff" and/or to be

placed in his "legal/medical" file, in which he stated that he had been denied Androgel for his arthritis at the JCADC, claimed that his arthritis had thus gone untreated, and stated that he had filed a federal lawsuit in 2006 as a result.  He also stated that he had been treated with Proscar prior to being detained in May 2005 at the JCADC, and "warn(ed)" that prostate medications other than Proscar "can give me serious side effects."  Medical records indicate that he made similar statements during his initial physician exam at the RDU.  The Physical Exam dated September 28, 2007, indicates that while Mr. Green reported he had been on Proscar for 8 years for an enlarged prostate, he refused the prostate exam and stated that they could not "stop giving him a medication" he had been on for 8 years.  He also mentioned his pending lawsuit against the JCADC.  RN Bell reported that Mr. Green "is being referred for CC for Prostate and arthritis problems," that Cardura has been ordered but "he states he will be refusing, he will not take anything but the Prosgar (sic) for his prostate," and he "is threatening to file grievances and lawsuits at this time."  MR at 28,30,32.

5.   The "Patient Chronic Care" report dated October 4, 2007, indicates that Mr. Green was evaluated at the RDU "for CC." He reported a history of low testosterone condition as well as arthritis and complained of pain in the knees, shoulders, and spine.  He stated that he had "been on Naprosyn, IBU and other meds for his joint pains," which had "not been of any help."  MR at 17-18.  Dr. Terry Jones "explained to the inmate that we do not have Proscar on the formulary" and "that we do not use Androgel for tx of arthritis regardless of what they currently do in Europe."  He

11

also "informed the inmate that he needs to try the Cardura since I do not know if I can get the Proscar approved." MR at 19. Dr. Jones submitted a "Formulary Exception Request" (FE) for Proscar on this date. MR at 17. Mr. Green was prescribed Cardura for 9/26/07 to 10/26/07. The "Medication Administration Record" for September 26, 2007, also indicates that Cardura was to be administered to Mr. Green for one month.

6. The FEs in the KDOC records, have two lines containing the same misspelled words that recur under "Reasons for Formulary Exception Request": "Inadequate clinical response to theraputic (sic) trails (sic) of the following formulary drugs (dosage and duration)" and "There is no formulary drug in the same theraputic (sic) category as the drug requested and no substution (sic)."[8] In Dr. Jones' FE requesting Proscar for Mr. Green, the only unique language is:

> He has been on Cardura, Hytrin, etc in the remote past. Inmate relates that those did not work and or caused intolerable side effects or 'allergies,'

and that Proscar had for several years markedly improved his problems with urination. Thus, this first FE request for Proscar at KDOC was based only upon Mr. Green's statements, rather than a current prescription or pre-incarceration medical records provided by Mr. Green or current medical tests performed or reviewed by KDOC doctors.

7. Mr. Green filed grievances claiming he was not being

---

[8]     In his opposing memorandum, plaintiff relies upon this form language. No fact allegations, medical records, or journal articles have been produced to show that there actually was no drug to treat BPH other than Proscar. Plaintiff's own fact allegations and the medical records suggest the contrary, that alternative medications were available.

provided proper treatment because Cardura had been prescribed instead of Proscar.  On October 17, 2007, the RDU Supervisor, RN Bell, answered his grievance in pertinent part as follows:

> We have a formulary that we must follow indicating which medications we are allowed to prescribe. Proscar is not on that formulary, therefore you were prescribed the comparable medication of Cardura.  You were admitted (to EDCF) on 092607, we received the order for the Cardura in place of the Proscar at that time.  According to the county that is the only medication you were taking while you were there.  You were then seen for your physical exam on 092807 at which time you were referred to our Health Care Practitioner for your chronic care issues including your prostate issue and arthritis.  You also signed a release . . . so that we could get your health history information. On 100407 you were seen by Dr. Jones for your chronic care issues.  It was explained to you, again, at that time that Proscar as well as the Androgel you were using for your arthritis are not medications on our formulary and, therefore, required special approval from our State Medical Director in order to prescribe.  Dr. Jones submitted the request to our Medical for the Proscar on that date.  We received the approval for the Proscar on 101107 and you started receiving the Proscar on that date. . . . All of our policies and processes were followed accordingly, you were treated with a comparable medication.  You indicate in your grievance that you were having "painful and counter productive side effects" from the Cardura, however, there is no documentation in your file that you reported these side effects.  If you were having "painful" side effects you should have submitted a Medical Request Form indicating that you were having pain and we would have assessed this.

MR at 4.  A Progress Note dated October 15, 2007, indicates that "Proscar has been approved," that Dr. Jones had reviewed the records from the JCADC, that lab tests showed Mr. Green's serum testerone level in the normal range and "level done in Johnson Co was normal."  Medication administration records indicate that Mr. Green was administered Proscar beginning October 5, 2007.

8.  Records dated October 17, 2007, indicate that from x-

rays at the EDU Mr. Green was diagnosed with "Mild medial and lateral compartment osteoarthritis." MR at 15. On October 30, 2007, Mr. Green was transferred out of the EDU, and arrived at the Norton Correctional Facility (NCF). The Transfer Receiving Screen indicates that an evaluation was done on that date, his file was reviewed, and his medications and health records were received. A "Medical Progress Note" of "sick call encounter" at the NCF on November 19, 2007, lists Mr. Green's medical problems as including arthritis and BPH. MR at 76. It also shows that Mr. Green requested Androgel for his arthritis, stating that he had it on the streets and it worked for his low testerone level as well. RN Pitts noted that Mr. Green arrived with two envelopes that "per his report" were filled with litigation and medical materials. Mr. Green was being administered aspirin, but on this date a "Formulary Exception Request" (FE) was submitted for Androgel to treat his arthritis. MR at 7, 78. The reason for the request included the following language:

> There is no formulary drug in the same theraputic (sic) category as the drug requested and no substution (sic). Inadequate clinical response to theraputic (sic) trails (sic) of the following formulary drugs . . . : reports has tried Naprosyn and IBU for arthritis.

This FE for Androgel was thus also submitted based upon Mr. Green's statements regarding prior treatment. Interim measures were "warm/cold packs" and stretching exercises as needed. Pitts recorded that she had discussed with patient the "likelihood of Androgel non-approval as his testerone level is normal and he is currently taking Proscar which may be contraindicated as prostrate abnormalities is s/e of Androgel." MR at 76. A Progress Note

dated November 22, 2007, indicates the "FE request for Androgel" was denied, and "alt recommendation of NSAIDS."  On November 29, 2007, Mr. Green wrote to NCF Warden Shelton that he would continue the grievance process to exhaust all administrative remedies "until the KDOC medical operations effectively treat my arthritis condition."  He made statements, not supported in the medical records, that Pitts had "agreed" he had "satisfied all requests to use standard medications including painkillers and muscle relaxers dating back 2 1/2 years."  He also stated that Dr. Feder and Dr. Gamble had prescribed Androgel.  The latter statement was contrary to plaintiff's own prior allegation that he was not provided Androgel at the JCADC and had filed a lawsuit as a result.  It was also contrary to the medical records from the JCADC showing that Dr. Gamble refused his request for Androgel explaining that it was not standard arthritis medication.  In addition, Green stated that he would "cease any further action" when KDOC decided to treat his condition in an effective manner, but until that time the "process leading to a civil action in (federal court) will continue."  MR at 9.  On December 6, 2007, Mr. Green was seen for lab work for "Arthritis Profile, Sed Rate, and PSA," but stated "I want to sign a refusal" and signed a refusal witnessed by two nurses.  MR at 66.  On December 17, 2007, Mr. Green was seen by RN Pitts for Chronic Care.  He told Nurse Pitts that "they drew 4 vials of blood in RDU," which Dr. Jones had stated "was everything," so he didn't understand why more was needed.  He then signed a "refusal for all labs, fasting DP2, arthritis profile sed rate and PSA."  Nurse Pitts commented that with respect to his arthritis needs, Mr. Green "refuses to have lab draws for verification."  MR at 63.  On

December 18, 2007, RN Chisham recorded in a "Progress Note" that the FE for Androgel was denied and use of occasional NSAID's was recommended instead, as "there was no medical indication for the start of (Androgel)." The Note also confirmed Mr. Green's "non-compliance with lab draw to help us confirm or rule out a diagnosis."

9. Mr. Green filed a grievance to which NCF Warden Shelton responded on December 18, 2007 as follows:

> Your grievance stems from a belief that you are not receiving proper medical care. . . . You also claim x-rays were taken at RDU for arthritis, however your condition remains untreated. You indicate a desire for a particular medication (Androgel) that has apparently been recommended or prescribed for you by physicians prior to your admission into KDOC custody . . . .
>
> CCS staff have indicated a request was submitted to the Regional Medical Director for approval of Androgel, but was disapproved. I am advised you had an appointment on 12/17/07 with the facility Health Care Provider who sought a blood draw for lab tests, which you reportedly refused.
>
> It appears CCS staff are taking appropriate steps to assess your medical needs and develop an appropriate treatment plan. Any medical care or treatment received prior to entering KDOC custody is relevant to the extent CCS staff receive records for review and compare them to current medical assessments, lab results and treatment protocols. . . .

MR at 5.

10. On January 4, 2008, defendant Lawhorn denied an FE request to renew plaintiff's prescription for Proscar.

11. A Mental Health Administrative Note dated January 16, 2008, indicated that Mr. Green "writes grievances on different departments almost every day" and that this behavior might be explained by a personality disorder diagnosis. MR at 58.

12.   On January 17, 2008, Mr. Green was seen and stated that he needed to get his prostate medication renewed because the order had been allowed to expire.  MR at 56.  LPN Delimont reviewed the record and found the FE order for three months of Proscar had expired on January 5, 2008.  She consulted RN Pitts, and entered orders: "no need to complete FE for Proscar" and "Start Cardura." Cardura was prescribed for January 17, 2008, through April 17, 2008.  Id.

13.   In a "Grievance-Response on Appeal" dated January 18, 2008, Secretary of Corrections Designee Rice stated:

> In this grievance, Mr. Green claims he is not receiving appropriate medical care.
>
> We have asked the Kansas Department of Corrections, Health Care Contract Consultant to review the care and treatment that the inmate is receiving.  We have been advised that this review is now complete.  The information that we have been provided indicates that the care and treatment that has been made available and afforded to the inmate has been consistent with prevailing community standards.

14.   The Medication Administration Record for the month of January 2008 indicates only that Mr. Green was issued Cardura medication on January 25, 2008.

15.   On January 29, 2008, plaintiff was seen for a "sick call encounter" at which he requested Proscar instead of Cardura. MR at 52-55.  Dr. Richards assessed "documented bph" and "hist of arthritis" and stated:

> I have researched this pt's file and it is well documented he has been on proscar . . . for 8 years straight; Dr. jones' FE request was granted for this med about 3 months ago and I am requesting an fe for 1 year so that pt may continue his long term use of proscar. . . .

Mr. Green was given a week "lay-in" and work restrictions" and told

to "rest in room most of time."  On this date, Dr. Richards submitted an FE for Proscar.  This request included the identical misspelled language of other requests: "Inadequate clinical response to theraputic (sic) trails (sic) of the following formulary drugs . . ."  It then provided that "pt. strongly asserts the cardura he was given instead of proscar caused him many problems, much pain and it did not work."  The "clinical justification" is "pt has clinically confirmed BPH and has been on proscar . . . for approx. 10 years, until quite recently."  Thus, this FE was based upon plaintiff's statements regarding past use rather than current medical testing by the KDOC physician.  There is no evidence in the record that Mr. Green had been compliant and adequately tested on Cardura at the time he made this request or that he had presented at the clinic with severe side effects from the Cardura or symptoms indicating that it was ineffective.  A Progress Note dated February 1, 2008, indicates that Mr. Green "received alternate treatment plan for recent request for Proscar." The Plan included to schedule Mr. Green "to be re-evaluated by HCP to have a rectal exam and to watch patient void per Dr. Lawhorn's recommendations."  MR at 48.

16.   On February 5, 2008, Mr. Green was seen by Dr. Messinger for a sick call encounter.  MR at 45.  Dr. Messinger recorded:

> Long Hx. Of BPH Sx., treated successfully with Proscar prior to incarceration.  Was stopped due to being non-formulary and Cardura ordered instead.  In the past 10 days or so urinary Sx. Of hesitancy, decreased force, polyuria, nocturia, pelvic pain.  Worsening with time.

The previous day another FE request for Proscar was submitted, this

time by Dr. Messinger, containing the same misspelled form
language.  The FE then provided:

> Has been on Proscar 8-10 years, and effective.
> Changed to Cardura due to non-formulary.  Has been
> taking 10 days or so and has had return of BPH SX,
> nocturia, hesitency (sic), pelvic pain, etc.
> Exam: plus 2 enlarged, tender.  Cardura not
> effective.  BP today 1226/83 so feel increase in
> Cardura not warranted.

Id.  This FE was thus based upon Mr. Green's statement that Proscar
had been effective for many previous years and his condition after
using Cardura for ten days at most, possibly less given his prior
declaration that he would take no alternative medication and later
findings of his non-compliance.  The plan was to "request OK for
Proscar" and "continue Cardura until Proscar available."

17.  Plaintiff filed another grievance, to which Warden
Shelton responded on February 11, 2008:

> Your grievance stems from the fact your
> prescription for Proscar expired on 1/5/2008 and
> Cardura was ordered in its place.  You . . . are
> asking to have Proscar reordered . . . .  There
> will be no override (from this office) of the
> decision to order Cardura when the prescription
> for Proscar expired - trained medical staff make
> those decisions.  If you experience side effects
> from any medication, you need to access the Clinic
> through established sick call procedures, which
> will allow staff to examine you, assess your
> needs, and take appropriate action. . . .

A copy of the February 4 FE is exhibited which has a handwritten
notation dated February 13, 2008: "OPR request canceled, appt 2-3
wks requested."  MR at 13.  On February 13, Dr. Messinger ordered
an appointment for Mr. Green within 2-3 weeks and entered the
following in a Medical Progress Note: "Entry to cancel OPR of 2-4-
08: need previous Hx. from treating MD re: Proscar prescription."
MR at 86.  On February 18, 2008, Mr. Green went to "sick call

encounter" due to cold symptoms, where Dr. Messinger explained "the alternative recommendation of continuing tx with Cardura," and prescribed Hytrin for one month beginning on that date. MR at 73. There is no indication in the record that any prison doctor had access to Green's pre-incarceration medical history at this time or that Mr. Green had been put through significant trials or testing at any KDOC institution.

18.   On February 27, 2008, Mr. Green was seen at another sick call encounter, and Dr. Messinger assessed "BPH sx not improved," and kidneys unchanged while on Hytrin. Dr. Messinger reported "need to increase Hytrin" dose for 30 days.

19.   On March 6, 2008, Mr. Green submitted a "medical Request" in which he complained that Dr. Jones', Dr. Richard's, and Dr. Messinger's "orders to renew Proscar have been ignored,"[9] and that Dr. Lawhorn had "overruled them based on profit." He stated that he had been taking Cardura and Terazosin and was having "trouble urinating on demand and the pain/insomnia has increased," and he had "been having increasing problems for 6 wks now, since the cancellation of Proscar." The response was to "use proper sick call procedure or send a Form 9." The medical records again reflect that Mr. Green failed to simply present with his symptoms at sick call so they could be medically assessed. MR at 14.

20.   On March 11, 2008, Dr. Messinger was allowed to observe plaintiff's symptoms, and recorded in a Medical Progress Note that he had

---

[9]   In his opposition memoranda, Mr. Green proclaims that it is a "well established fact that all (his) attending physicians prescribed either Proscar or Androgel for" his BPH and arthritis condition.

> observed pt. voiding, he does have difficulty
> starting stream, moderate to marked slow stream
> interspersed with dribbling.   Through voiding
> process he had to stop and start several times and
> had significant pushing to restart stream.  Voided
> 100 cc.  Reports nocturia 4-5 x's per night.

The assessment was "Symptomatic BPH," and the order was to continue Hytrin until next clinic visit.  MR at 58.  On March 17, 2008, Dr. Messinger noted in Medical Progress Note: "No improvement with Hytrin at 5 mg daily.  Will increase to 10 mg one week" and follow-up in one week.  MR at 56.  However, on March 19, 2008, Mr. Green reported that upon taking the first increased dose of Hytrin, he had "immediate side effects" including "seeing spots," becoming "drowsy and dizzy," and shortness of breath.  He stated that he felt the side effects all the previous day but had not come to the clinic because he "did not think it was an emergency."  He also stated, "I believe this unethical experiment should cease."  LPN Delimont recorded that the "pt ambulates into the clinic without difficulty, verbalizes without problems," no skin rash, and "no distress noted during encounter."  She further recorded that the Hytrin "was increased after receiving a form 9 from Pt about 5 mg not being effective (pt was only on 5 mg for 1 week and Pt had missed 3 of the 8 doses)."  Mr. Green was again "advised that needs to access clinic when feels Sx of SOB and dizziness for a evaluation."  The Hytrin dosage was reduced to 5 mg.  MR at 51.

    21.  On March 25, 2008, Mr. Green stated at sick call that he was deaf in one ear so he "could not hear the med. call," and "can't take the 10 mg dose . . . ."  He complained that he was "tired of being experimented on like a guinea pig."  Dr. Messinger recorded: "F/U non compliance Hytrin, Argumentative re: compliance,

21

POC," and continued Hytrin at 5 mg with follow-up in 2 weeks.   MR
at 45.

22.  On this same date, Mr. Green filed a Medical Request
in which he stated:

> KSA 65-2837 . . . forbids experimental forms of
> therapy" and that "since cancellation of a proven
> effective medication Proscar, CCS has used drugs
> and experimented with dosage amounts which still
> cause me extreme pain and discomfort.  I will no
> longer be a guinea pig.  If I am not given Proscar
> . . . I refuse any further experiments.

MR at 15.  On April 2, 2008, Mr. Green submitted a complaint to the
State Board of Healing Arts against Dr. Feder and Dr. Lawhorn.[10]
(Doc. 10) at 25.

23.  On April 4, 2008, Dr. Messinger saw Mr. Green who
stated that he "wanted to make sure" his "hx of arthritis in knee
and shoulder" was documented.  Dr. Messinger observed that Green
presented  to  the  clinic  "ambulatory,  ambulated . . .  with
exaggerated limp fast pace," . . . "able to perform range of motion
with affected limb, able to bear weight," and "in/out chair without
difficulty, right knee evaluated no redness, bruising or swelling
noted."  MR at 34.

24.  On April 8, 2008, Mr. Green had a physical exam at
which Dr. Messinger found "250 cc urine obtained, voiding straight
cath post voiding with no residual" and ordered "will not renew
Hytrin at this time."  Dr. Messinger submitted another FE for
Proscar, which noted a diagnosis of "BPH, urinary difficulties:
intermittent, hesitancy, dribbling, nocturia up to 6 times."  This
request  contained  the  same  form  language  as  other  FEs  and  the

---

[10]     He then told prison and medical staff that it was against state law
for Dr. Lawhorn to continue to be involved in his medical treatment.

following:

> Has taken Cardura with reported intolerable SE.
> Also Hytrin 5 mg daily at least one mo.  Tried
> Hytrin 10 mg. Had intolerable SE of vertigo,
> mental disturbances.  Exam one mo previous: 2 plus
> prostate enlargement, no nodules.

The "Clinical Justification" included:

> Reports problems for past 6-8 years, controlled
> with Proscar both prior to incarceration and first
> several mo. . . .  Was stopped due to non
> formulary and tried on Cardura and Hytrin," . . .
> .  Post voiding cath performed without obtaining
> any urine.

MR at 2.  On April 9, 2008, Mr. Green was seen for chronic care.

He reported "split stream, starts and stops takes a lot of effort

to urinate continues to go frequently or not able to go,

intermittent, night urination 6-12 times" and "knee with pop and I

fall to ground."  MR at 29.  On April 10, 2008, Dr. Messinger's

assessment was PBH, and he found in Medical Progress Note: Reply

from PE (sic) for Oroscar (sic): "med not deemed necessary due to

there being no residual by straight cath. after normal voiding."

Dr. Messinger commented: "No need for Proscar."  MR at 3.

25.  On April 11, 2008, Secretary of Corrections designee

Rice wrote Mr. Green the following letter:

> This letter is in response to your correspondence
> dated February 27th, February 18th, March 10th, March
> 12th, and April 4th, and to phone contact with your
> father.
>
> The (KDOC), Health Care Contract Consultant
> reviewed your medical care and made
> recommendations to (CCS) to place you on Proscar
> as you had (sic) previously were able to manage
> your prostate symptoms while on Proscar. . . .

See MR at 5.  Mr. Green has repeatedly claimed that this letter or

the referenced recommendation was an "order" by Rice for him to

receive Proscar that was being ignored, and does so again in his

Memorandum in Opposition to Lawhorn's summary judgment motion.[11]
He again neglects to mention however, that this letter was
rescinded by Rice in the following "Grievance-Response on Appeal
dated June 17, 2008:

> FINDINGS OF FACT Green refuses to be examined by
> CCS Doctor at LCF. Green cannot be prescribed a
> medication change until he has been examined by
> CCS. Because of his refusal to submit to medical
> examination the letter dated April 11, 2008 from
> this office is no longer valid. The information
> that we have been provided indicates that the care
> and treatment that has been made available and
> afforded to the inmate has been consistent with
> prevailing community standards. . . .
>
> CONCLUSIONS MADE [W]e believe the inmate has
> access to adequate medical care.

MR at 1.

26. On April 15, 2008, Mr. Green was received at Lansing
Correctional Facility (LCF). He was examined and his x-ray film,
health record, and chart were received. On April 16, 2008, he went
to sick call and requested Androgel for his arthritis and Proscar
to replace Hytrin. He stated that Hytrin did not work and had many
side effects. He was referred for medical evaluation. MR at 91.
On April 17, 2008, Dr. Satchell submitted another FE for Proscar,
again based upon Green's self-reporting. The reasons included the
same form language followed by "Cardura and Hytrin. Had dizziness
and equilibrium problems on Hytrin." The clinical justification
was decreased urinary stream and hesitancy. MR at 90. This FE was
denied. See MR at 86.

---

[11]     Plaintiff claims that this particular Rice letter is also proof of
a fully exhausted grievance. However, Rice's response specified that it was in
response to several letters from plaintiff and communication from his father, not
that it was a response to an appeal of the denial of an administrative grievance.
In any event, failure to exhaust is not among the grounds for Lawhorn's summary
judgment motion.

27.   On April 24, 2008, Mr. Green was taken to the lab for a blood draw.  The Lab Tech noted: "Inmate did not want to have his blood drawn" and "wants to be back on proscar."  MR at 87.  Mr. Green signed a Refusal to Submit to Treatment on that date in which he stated he would "not allow any more experimentation, to be stabbed, poked or be treated like a guinea pig," and that he was "tired of the excuses and torture" and would "not start the process over again."  MR at 16, 87.  On April 25, 2008, RN Derrell recorded in a Nursing Progress Note that Mr. Green had a "HX of +PPD," but "refused all lab work" and claimed that "they won't treat my medical conditions here."  MR at 82.  On April 28, 2008, Mr. Green was seen at sick call for "Follow up Prostate Exam."  Dr. Satchell recorded, "Inmate doesn't want another exam, refuses exam" and "no follow up at this time."  MR at 79.

28.   On May 13, 2008, Mr. Green was seen at sick call with regard to his alleged need for Proscar, but was not examined.  Dr. Satchell recorded that Dr. Lawhorn was present, and "once again offered (Green) an evaluation prior to treatment for his concern of prostatic hypertrophy," but Mr. Green "signed another refusal for evaluation."  Dr. Satchell also recorded: "Dr. Lawhorn pleaded with him to reconsider and if he changed his mind, to notify us."  A release of medical information directed to Dr. Feder specifically requesting Proscar and Androgel treatment records was obtained at this time from Mr. Green.  MR at 77, 56.  On July 2, 2008, Mr. Green prepared his own "Official Written Authorization" for Dr. Feder to release all records of his treatment with Proscar and Androgel.  MR at 18.

29.   On May 20, 2008, LCF Warden McKune responded to

another grievance from Mr. Green (# AA20080746), that apparently complained of a lack of medical treatment:

> After an investigation by the Grievance Officer, and a complete review of the applicable documentation, it was determined the response provided by your assigned Unit Team Manager, with input from (CCS) is appropriate . . . . Additionally, I recommend that you cooperate with our Correctional Staff and Health Care provider concerning your medical needs and wellbeing (sic).

MR at 13.  On May 31, 2008, Mr. Green submitted an "Inmate Request to Staff Member" to Dr. Satchell, which he titled his "Monthly Medical Report."  Therein, he stated that his "file" contained x-rays, blood work, exams, botched experimentation from forced drug replacement, and severe side effects "caused by failure to comply with seven attending physicians orders."  He stated that his present condition was "painful arthritis and prostate complications" that "remain untreated."  He complained that "CCS/KDOC opts for experimentation and torture instead of treatment with proven medications" and that Dr. Lawhorn was improperly making all decisions.  At the same time he stated, "do not call me to the clinic," and "read my file and treat me, or nothing."  MR at 73.

> 30.  In June 2008, Mr. Green submitted a "Medical Request" to CCS in which he stated:

> Since my prostrate medication Proscar was cancelled in January 08, I've had a split stream, constant stop-n-start urination, weak stream, soreness in the testical area, straining to go and insomnia.  The symptoms get worse and more painful each week.  I've been untreated for five full months . . . .  Arthritis is also bad.

On June 12, 2008, he submitted a "Medical Request" stating he was having pain from an arthritis flare up, and that his arthritis was not being treated with any medication.  The responses to both June

requests indicate he was promptly seen by Dr. Satchell.  On June 6, 2008, Mr. Green was seen at sick call for "numerous complaints" including that he had not received approval for Proscar and that he had "been untreated for 5 months."  Green threatened that a lawsuit would cost CCS and KDOC more money than giving him the treatment he desired.  He complained of insomnia, arthritis, continued difficulty with urination, and testicle pain that "gets worse every week."  However, it was noted that he had signed a refusal for evaluation on 5/13/08.  A follow-up with Dr. Satchell was planned.  MR at 75.  On June 13, 2008, Dr. Satchell recorded in Medical Progress Note that Mr. Green "wanted to report that he still has arthritis and prostate issues."  Satchell ordered "no tx at present" and commented that Green "doesn't want me to call him to the clinic anymore."  MR at 74.

31.  Since July 2008, KDOC and Dr. Satchell have had Dr. Feder's one-page medical record.  This record showed that Dr. Feder treated Mr. Green for BPH and hypogonadism, and had prescribed Proscar and Androgel.  However, no reference is made to arthritis or any unsuccessful testing with alternative medications.

32.  On October 8, 2008, Mr. Green was seen at sick call by Dr. Hoang, and requested the medication prescribed by Dr. Feder: Proscar and Androgel.  Green stated that he had been examined by four different physicians and did "not need more exam."  Dr. Hoang's assessment was "non compliance."  MR at 60.

33.  On October 31, 2008, Mr. Green was transferred out of LCF-Medium to LCF-Maximum.  The Transfer Out Screen indicated that Green reported a history of arthritis and BPH but "refuses formulary medication and refuses to be tested to get non formulary

meds." It also indicated that he "refused lab update." MR at 62-63.

34.   On November 14, 2008, Mr. Green went to sick call, stated that "Proscar was approved by CCS in the past because of adverse effect of hytrin (and) cardura," and requested a renewal. He complained of urinary problems, back pain and "mild arthritis." MR at 58. Dr. Hoang then submitted another FE for Proscar, in which the usual form language was followed only by "A FE." The Clinical justification was: "Patient was approved by CCS in 2007 for Proscar due to affects (sic) of Alpha Adrenergic Blockers as hytrin cardura . . . ." On November 18, 2008, Mr. Green stated at sick call that he wanted to be medicated with Androgel. The LPN recorded that Green reported a prostrate problem, arthritis and "numerous complaints," and referred him to an HCP. MR at 56. On November 20, 2008, Mr. Green's case was "discussed at care management" and it was recorded that:

> Fe for Proscar submitted by Dr. Hoang returned with the following recommendations for alternative care: Patient has been evaluated by Dr. Satchell and has refused exams and other treatment. Please discuss with Dr. Satchell before resubmitting as the facts are not correct.

This information was provided to Dr. Satchell and Dr. Hoang for review. MR at 55. On December 15, 2008, Mr. Green went to sick call and requested prostate meds and reported a history of arthritis. A 10-day lay-in and "arthritis profile" were ordered by Dr. Satchell. MR at 42.

35.   On February 2, 2009, A Transfer Out Screen indicated that Mr. Green was transferred to LCF-East Unit. His list of medical problems included arthritis and BPH. MR at 14.

28

36.  On February 17, 2009, LPN Kinsey recorded in a Nursing Patient Progress Note that Mr. Green went to the clinic and stated:

> I don't ever want any treatment from Dr. Lawhorn. I refuse to allow him to make any medical decisions on my behalf pursuant to KSA 65-2837 . . . . I already signed a form stating that I refuse treatment from Dr. Satchell as well.  I want this in writing.  Any other MD will be OK.

37.  On March 2, 2009, Mr. Green was seen by Dr. Legler who recorded the following:

> Patient discussed at length his need for what he deems to be the proper medications for his prostate.  I was unable to have any meaningful conversation with him, as he essentially would not let me speak.  Would not discuss need for prostate exam unless I could promise that he would get the "proper" medication.  Inmate was finally asked to leave by corrections officer as he would not let me have any constructive discussion with him.

Dr. Legler ordered "no TX at this time."  MR at 6.  On March 13, 2009, Mr. Green was seen by Dr. Legler who recorded: "Prostate Exam - F/U Proscar.  Inmate informed that he would not get Proscar.  He left."  MR at 100.


**F.  Qualified Immunity**

The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Thus, the Supreme Court has determined

that immunity questions should be addressed at the earliest possible stage in litigation. <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991). For this reason, the court addresses this defense first. "When a defendant asserts 'the qualified immunity defense, the burden shifts to the plaintiff, who must meet a strict two-part test by showing (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct.'" <u>Wells v. Krebs</u>, 432 Fed.Appx. 724, 727 (10th Cir. 2011)(unpublished)(citing <u>Bowling v. Rector</u>, 584 F.3d 956, 964 (10th Cir. 2009)(internal quotation marks omitted); <u>see</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Having thoroughly reviewed the record, the court finds for reasons stated hereinafter that plaintiff has failed to show an Eighth Amendment violation. Accordingly, defendant Lawhorn is qualifiedly immune from suit and entitled to summary judgment. <u>Wells</u>, 432 Fed.Appx. at 727.

### G. Plaintiff's Allegations Fail to State a Claim

#### 1. Standards

Plaintiff has repeatedly been advised that "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be granted." <u>Hall</u>, 935 F.2d at 1110. A court will not construct legal theories which assume facts that have not been pleaded. <u>Dunn v. White</u>, 880 F.2d 1188, 1197 (10th Cir. 1989), <u>cert.</u> <u>denied</u>, 493 U.S. 1059 (1990). Nor is the court obligated to "supply additional factual allegations to round out a plaintiff's complaint." <u>Whitney v. New Mexico</u>, 113 F.3d 1170,1173-74 (10th Cir. 1997).

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Id. at 104 (quoting Greg v. Georgia, 428 U.S. 153 (1976)). "Deliberate indifference involves both an objective and a subjective component." Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000); Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006). The objective component is satisfied when the medical condition complained of is "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999). Under the subjective component, "a prison official must have a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991); Farmer, 511 U.S. at 834. This component is satisfied only if the plaintiff establishes that the "defendant knew [plaintiff] faced a substantial risk of harm and disregarded that risk; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 847; Hunt, 199 F.3d at 1224. Prison guards or medical staff show deliberate indifference where they intentionally prevent the inmate from receiving prescribed treatment or intentionally delay or deny him access to medical care. Estelle, 429 U.S. at 104-05; Farmer, 511 U.S. at 837; Sealock, 218 F.3d at 1211; Oxendine v. Kaplan, 241 F.3d 1272, 1279 (10th Cir. 2001).

However, no claim of constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning the appropriate course of treatment. Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir. 1992); Tyler v. Sullivan, 83 F.3d 433, 1996 WL 195295, at *2 (10th Cir. 1996)(Table)("A difference of opinion as to the kind and timing of medical treatment does not rise to the level of an Eighth Amendment violation.")(citing Estelle, 429 U.S. at 105-06; Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993)). Whether a particular form of medical treatment is indicated "is a classic example of a matter for medical judgment," and a physician's exercise of such judgment is insufficient to sustain a claim under the Eighth Amendment. Estelle, 429 U.S. at 107 (noting that medical decision to forego one form of treatment does not represent cruel and unusual punishment and at most is medical malpractice, with the proper forum being state court); see also Perkins v. Kansas Dept. Corrections, 165 F.3d 803, 811 (10th Cir. 1999)("[A] prisoner who merely disagrees with a . . . prescribed course of treatment does not state a constitutional violation."); Olson, 9 F.3d at 1477 ("[a] difference of opinion does not support a claim of cruel and unusual punishment"); Ledoux, 961 F.2d at 1537 ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating [medical provider] . . . is . . . . insufficient to establish a constitutional violation.")(citations omitted); Henderson v. Secretary of Corrections, 518 F.2d 694, 695 (10th Cir. 1975)("The prisoner's right is to medical care-not to the type or scope of medical care which he personally desires.")(citing Coppinger v. Townsend, 398

32

F.2d 392, 394 (10th Cir. 1968)).   Furthermore, allegations of negligence in diagnosing or treating a medical condition do not give rise to an Eighth Amendment claim.   <u>Estelle</u>, 429 U.S. at 105; <u>Boles</u>, 361 Fed.Appx. at 15 (citing <u>Berry v. City of Muskogee</u>, 900 F.2d 1489, 1495-96 (10th Cir. 1990)).   "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."   <u>Estelle</u>, 429 U.S. at 106.

### 2.  Analysis

Applying the foregoing legal standards to the undisputed facts, the court has no difficulty concluding that plaintiff fails to state a constitutional claim of denial of medical care based upon his allegations that he was denied treatment for arthritis because he was not treated with Androgel.   Plaintiff claims in his opposition memorandum that Lawhorn "learned that NSAIDS had been ineffective" in treating Green's arthritis condition "from the JCADC and Dr. Feder medical files," and thus left Green "untreated" for 3 years.   Plaintiff does not refer to any page of the JCADC or KDOC medical records to support his allegation that Dr. Lawhorn knew NSAIDS were ineffective.   No record provided with the Martinez Report indicates that NSAIDS were determined to be ineffective. Plaintiff's allegation that Dr. Feder treated his arthritis with Androgel is refuted by the medical record he provided.   Arthritis was not noted as a condition on Dr. Feder's record, which showed that Dr. Feder treated Mr. Green for hypogonadism.   The undisputed record before the court shows that Mr. Green was diagnosed at the KDOC with arthritis.   However, it also shows that despite Mr. Green's desire for Androgel, he did not establish that it had

previously been prescribed for his arthritis.  The record further shows that Green was informed by Dr. Gamble at the JCADC and more than one medical provider at KDOC prisons that Androgel was not standard treatment for arthritis and could even be counter-indicated, given his BPH.  It follows that Mr. Green can make no showing that Dr. Lawhorn violated his constitutional right to medical treatment by disallowing treatment of his arthritis with Androgel.  Nor can he claim that his right to treatment was violated by a lack of other effective treatment, given that he refused medical testing to evaluate his arthritis condition while using alternative treatments.

        The court likewise has no difficulty determining that plaintiff states no constitutional claim based upon his allegations that he was denied treatment for BPH because he was not treated with Proscar. As soon as Mr. Green was taken into KDOC custody, he tried to insist upon treatment with Proscar.  While Mr. Green has repeatedly made the conclusory statement that his BPH condition was left untreated, the KDOC medical records show that upon plaintiff's arrival he was given a one-month prescription for Cardura to treat his BPH.  Mr. Green soon received Proscar for 90 days but when that supply was depleted, Cardura was again prescribed.  Hytrin was also prescribed.  The undisputed facts and the record thus show that while Mr. Green was denied his medication of choice, KDOC doctors did not completely deny him treatment for his BPH.  Thus, Mr. Green's conclusory claim that defendant Lawhorn prevented him from being properly treated turns out to be, as the court anticipated and forewarned Mr. Green much earlier in this case, nothing more than his disagreement with the type of treatment he was offered and

received, and therefore not cognizable under the Eighth Amendment.[12] <u>Boles</u>, 361 Fed.Appx. at 18 (citing <u>see</u> <u>Perkins</u>, 165 F.3d at 811); <u>Wells</u>, 432 Fed.Appx. at 727.

Mr. Green's own averments and the medical records also clearly demonstrate that he often failed or refused to take alternative medications that were offered, and refused to fully cooperate and participate in trials and medical tests to evaluate and monitor his prostrate condition along with the effects of alternative medications.  The record shows that anytime Mr. Green went without treatment for his BPH, it was due to his acts of non-compliance rather than any acts of defendants.  Upon first being prescribed Cardura, Mr. Green announced that he would refuse it and take nothing but Proscar.  This scenario in no way suggests an Eighth Amendment violation by defendant Lawhorn.  <u>See</u> <u>Carter v. Troutt</u>, 175 Fed.Appx. 950 (10th Cir. 2006)(unpublished)(No Eighth Amendment violation by prison doctor who refused to prescribe a certain pain medication where he prescribed other medications for the prisoner, prisoner missed his followup appointment for treatment, and he refused to be examined unless he was prescribed the pain medication he wanted.); <u>Mosley v. Snider</u>, 10 Fed. Appx. 663 (10th Cir. 2001)(unpublished)(Inmate did not state an Eighth Amendment claim based upon his allegations that his prescription was discontinued because facility physician determined it was no longer needed, a different medication was prescribed but the inmate refused to accept it, and the inmate then missed his next three medical appointments.); <u>Olson v. Coleman</u>, 993 F.2d 1551

---

[12]     It is plain that the actual dispute between plaintiff and defendants was the efficacy of the alternative medications.

(Table)(10th Cir. Apr. 28, 1993)(Plaintiff's claims of denial of medical care must fail in light of testimony that plaintiff refused medical care while at the correctional facility.); <u>Ledoux</u>, 961 F.2d at 1536 (No merit to arguments concerning defendants' alleged deliberate indifference to medical needs because plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist were insufficient to establish a constitutional violation.).

Mr. Green complained several times at sick calls and in grievances that he was experiencing "painful side effects." The first exhibited administrative response indicates that an investigation had revealed no record of his having gone to the clinic for medical evaluation or treatment of his symptoms, and that he had refused medical testing. In response to another grievance, he was again told to go to the clinic with his side effects so he could be examined and his condition evaluated by a medical provider. On February 5, 2008, Green reported to Dr. Messinger that he had urinary symptoms the "past 10 days or so," and Dr. Messinger increased the Hytrin dosage. Then, the very next day Mr. Green went to the clinic and complained that all the previous day he had suffered serious side effects, but had not gone to the clinic while having those symptoms because he didn't feel it was an emergency. A week later Mr. Green submitted a Medical Request complaining that his urinary problems had worsened over 6 weeks, and was again instructed to use the sick call procedure. The record thus shows that while plaintiff repeatedly complained of side effects and symptoms after brief periods of being prescribed

alternative medications, he failed to go to the clinic at the time he was actually suffering symptoms or side effects so that his condition could be observed and medically evaluated.

Mr. Green has utterly failed to present any evidence to this court suggesting that defendant Dr. Lawhorn knew that no medication other than Proscar could effectively treat his BPH. He did not present KDOC medical staff with a current prescription from Dr. Feder for Proscar or Androgel. He eventually produced a single sheet from Dr. Feder, which indicated only that he had been treated for BPH with Proscar prior to 2005. He did not present a medical record showing extensive medical testing done by Dr. Feder or even Feder's opinion in an affidavit that Proscar had proven to be Green's only effective treatment. When Mr. Green was taken to the JCADC he specifically requested treatment with Proscar, which Dr. Gamble was himself able to approve. However, Mr. Green does not provide or refer to a single record showing that he went through extensive testing or trials at the JCADC with the available alternative medications that resulted in findings that Proscar was the only effective BPH treatment for him. Medical records from the JCADC provided with the Martinez Report show no such testing.[13] Plaintiff has thus presented no evidence that would show a jury that it was medically necessary for him to receive Proscar.

The fact that several prison doctors submitted requests for formulary exception for Proscar does not establish that Mr. Green had a serious medical need to be treated only with Proscar that was

---

[13]     There is even the one medical test in the KDOC medical records, which showed that at one point within the relevant time frame, a prison doctor found after testing Mr. Green that Proscar was not needed.

ignored by defendant Lawhorn.  The first FE for Proscar based upon Mr. Green's statements was allowed.  However, defendant Lawhorn denied subsequent FEs for Proscar submitted by various prison doctors that were also based mainly upon plaintiff's statements.[14] Green's allegation that Dr. Lawhorn's decisions regarding his medications were not an exercise of his medical judgment is completely conclusory.  He presents no factual support for this claim, and none is found in the medical records.  The court repeats that "no claim of constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning the appropriate course of treatment."  Ledoux, 961 F.2d at 1537; see also Self, 439 F.3d at 1232 ("[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment.  Matters that traditionally fall within the scope of medical judgment are such decisions as to whether to consult a specialist or undertake additional medical testing.").  Green's allegation in his complaint that Lawhorn deprived him of "lawfully prescribed medication" is also conclusory.  Mr. Green was made aware that in the medical judgment of Dr. Lawhorn, alternative drugs and dosages had not been adequately tested and his alleged symptoms and side effects had not been adequately evaluated so that his need for Proscar in particular had not been established during the time the KDOC was

---

[14]    The record does not indicate that any FE was submitted after the requesting physician had actually examined current medical records of trials with alternative medications, or had himself conducted trials of adequate duration with monitoring and assessment upon actual presentment of symptoms or side effects while Mr. Green was actually taking the alternative medication.

responsible for providing his medical care.   The FEs that were
submitted do not even establish that Dr. Lawhorn's medical
judgment, that Green's need for Proscar had not been adequately
established, was "egregiously bad" as Mr. Green claims.  They are
certainly not indicative, in any way, of a sufficiently culpable
state of mind on the part of Dr. Lawhorn.   There is nothing in the
record to suggest that defendant Lawhorn's medical judgment was so
far-fetched as to plausibly state a claim of deliberate
indifference on his part.   Plaintiff's bald allegations that
Lawhorn acted out of anger, embarrassment, wrongful consideration
for cost alone, or some other improper motive are purely
speculative rather than plausible.   In short, Mr. Green has not
come forward with any evidence that would satisfy the subjective
component of the deliberate indifference test as to defendant
Lawhorn.

Furthermore, even if Mr. Green were to prove that Dr.
Lawhorn's medical judgment was unsound or that the alternative
treatment he received or was offered was ineffective, these
allegations amount to no more than a claim of negligence.   "[A]
complaint that a physician has been negligent in diagnosing or
treating a medical condition does not state a valid claim of
medical mistreatment under the Eighth Amendment.'"   Green v.
Branson, 108 F.3d 1296, 1303 (10th Cir. 1997)(citing Estelle, 429
U.S. at 106).   "Even '[a] negligent failure to provide adequate
medical care, [and] even one constituting medical malpractice, does
not give rise to a constitutional violation.'"   Losee v. Garden,
420 Fed.Appx. 821, 824 (10th Cir. 2011)(unpublished)(citing Perkins,
165 F.3d at 811).   The court concludes that Mr. Green has not

satisfied his burden of showing a genuine issue of material fact as to whether defendant Lawhorn was deliberately indifferent to his medical needs.   Accordingly, defendant Lawhorn is entitled to judgment and his Motion for Summary Judgment is sustained.

## II.  DISMISSAL OF COMPLAINT FOR FAILURE TO STATE A CLAIM

The court has a continuing duty to dismiss a prisoner's complaint at any time it appears that plaintiff has failed to state a federal constitutional claim.  See 28 U.S.C. § 1915A(b)(1); cf. 28 U.S.C. § 1915(e)(2)(B)(ii)("Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted.").   Other courts have, under this continuing duty, dismissed prisoner claims of denial of medical treatment for failure to state a claim based upon medical records submitted with a Martinez Report.

In this case, Mr. Green's allegations utterly fail to show that Lawhorn or any other defendant was deliberately indifferent to his serious medical needs.   On the other hand, the KDOC medical records, which have not been refuted with any competent evidence, plainly show that KDOC prison officials were responsive to plaintiff's medical needs.   Mr. Green was screened and evaluated, was promptly provided medical attention by many nurses and doctors numerous times for prostate and arthritis problems whenever he requested, and all his Chronic Care conditions were monitored to the extent he would allow.   It was explained to Mr. Green many

times that Proscar was non-formulary, and that alterative formulary medications were available.  He was also informed early on that any non-formulary medication had to be approved by the medical director before it could actually be prescribed by his treating prison physician and repeatedly informed that the requests for an exception in his case had been denied.  The record clearly reflects that while Mr. Green was denied his preferred non-formulary medication, medical treatment was continuously made available to him for his conditions and he was either prescribed or offered alternative medications or treatments that were formulary or standard.  Mr. Green does not show that the team of physicians responsible for his medical care in prison, which despite his contrary argument included Dr. Lawhorn, denied him necessary medical treatment.  In sum, plaintiff has failed to establish that either defendant Lawhorn or defendant Dr. Satchell denied, delayed, or intentionally interfered with his necessary medical care.

The court concludes that the materials properly before this court show that the plaintiff's allegations present no plausible claim for relief.  Therefore, the court's duty arises under § 1915A to dismiss the complaint.  Accordingly, the court also finds, under 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B)(ii) and from its review of all materials filed in this case, that Mr. Green's allegations of denial of medical treatment amount to nothing more than his disagreement that particular medication he preferred was not provided for his prostate and arthritis conditions.


**III.  DEFENDANT SATCHELL**

The court previously found that defendant Dr. John Satchell had not been effectively served within the 120-day time limit set forth in Fed.R.Civ.P. Rule 4(m).[15]  Plaintiff was given time to show cause why this action should not be dismissed as against defendant Satchell as a result.  The court has considered his Response Opposing the dismissal of Dr. Satchell.  Plaintiff alleges that he was unaware that defendant Satchell had not been served, and that he depended upon the U.S. Marshal to properly and timely serve this defendant.  Plaintiff does not provide any information as to defendant Satchell's whereabouts for personal service.  Nor does he allege facts showing good cause for his failure to diligently prosecute his case against Dr. Satchell.  Despite the fact that other defendants long ago filed answers or responses to his complaint, Mr. Green made no inquiry about the status of service of defendant Satchell.  Thus, the court finds that plaintiff has not shown sufficient cause for either a mandatory or permissive extension of time in which to serve this defendant.  See Espinoza v. United States, 52 F.3d 838, 841 (10th Cir. 1995); Fields v. Oklahoma State Penitentiary, 511 F.3d 1109, 1113 (10th Cir. 2007)("It is the plaintiff's responsibility to provide the United States Marshal with the address of the person to be served, see form USM-285; the Marshal is not charged with finding a defendant who has moved without providing an accessible forwarding address.").

---

[15]     The docket sheet reflects that on March 30, 2010, the court directed the Clerk of the Court to prepare waiver of service forms to be served by the U.S. Marshal Service (USMS).  On April 9, 2010, the USMS mailed the waiver of service forms to Mr. Satchell.  The waiver was not returned. This was apparently the only effort to effect service by the USMS.  As a result, defendant Satchell was not served.

Were this action dismissed as against Dr. Satchell for lack of timely service alone, it would be a dismissal without prejudice. However, under the court's continuing duty to dismiss an action that fails to state a claim, it also concludes that this action should be dismissed against Dr. Satchell because the record now before the court plainly shows that Mr. Green was provided, rather than denied, medical treatment during the relevant time periods. It also plainly shows that Dr. Satchell provided Mr. Green with medical attention when requested. The fact that Dr. Satchell was unable to provide the particular medication Green desired because his FE was not approved does not evince a federal constitutional violation on the part of Satchell. Plaintiff does not suggest what Dr. Satchell could and should have done to secure the Proscar he had tried to obtain, given the medical director's denial of the formulary exception. It follows that Mr. Green's allegations fail to state a claim against defendant Dr. Satchell. See Arocho v. Nafziger, 367 Fed.Appx. 942, 946 (10th Cir. 2010)(unpublished).

## IV. PLAINTIFF'S MOTION TO APPOINT COUNSEL

Mr. Green again seeks appointment of counsel (Doc. 74). He argues that he must be provided counsel because he has diligently tried to engage counsel without success and due to the court's prior denials of counsel. He now also claims in his opposing memoranda that he is mentally incapacitated, and "cannot possibly act as his own counsel" or "make decisions in this case." In support, he alleges that since his release he has been diagnosed with severe anxiety disorder, posttraumatic stress disorder (PTSD),

43

and depression, and that he has had several mental breakdowns.[16]
He generally asserts that he must be provided counsel or "due
process of law and equal protection" will be violated.

Under 28 U.S.C. § 1915(e)(1), a district court may, in its
discretion, appoint counsel in a civil case, but civil litigants
enjoy no constitutional right to an attorney.  Johnson v. Johnson,
466 F.3d 1213, 1217 (10th Cir. 2006)(per curiam).  The court is not
convinced by plaintiff's general allegations that he lacks the
mental capacity to continue to proceed pro se in this case.  Mr.
Green does not explain how his current diagnosis differs from the
anxiety disorder for which he was treated with psychotropic
medications prior to his confinement in the JCADC.  His exhibits
regarding his mental condition since his release from prison were
prepared in connection with his current work status.  These
exhibits and his opinion that his mental problems currently prevent
him from making decisions in this matter are simply not adequate to
establish his mental incapacity.

Nor is the court convinced by Mr. Green's statements that
he must have counsel because he has no legal training, lacks
resources and the case is too complex.  The record reflects that
the factual and legal issues in this case are not particularly
complex.  Mr. Green is of at least normal intelligence, writes
clearly, and has repeatedly demonstrated his ability to file
motions and obtain and produce documents.  He has had ample time to

---

[16]    He attaches to his Memorandum in Opposition a diagnosis recently
rendered by a physician "regarding the patient's ability to perform his/her
duties at work" in August 2011 "through 09/01/11," in connection with Green's
application for a short-term work disability.  That diagnosis included not only
PTSD and anxiety disorder, but also "significantly dysfunctional coping skills,"
historic substance dependence and perhaps persistent use, and noted possible PTSD
from being "beaten very badly" in prison.

request and obtain relevant medical records or affidavits from his prior physicians Dr. Feder and Dr. Gamble, and to request affidavits from any KDOC doctors or nurses, if those materials supported his claims.  Thus, Mr. Green's bald statement that he is incapable of obtaining evidence is likewise not supported by sufficient facts.  Further, plaintiff's claims are found to have no merit.  Because plaintiff fails to show that he has a colorable claim but lacks the capacity to present it, his motion for appointment of counsel is denied.

## V.  PLAINTIFF'S THIRD MOTION FOR DEFENDANTS TO COMPLY WITH ORDER OF 3/30/10

This motion has already been denied by the court, upon its finding that the Martinez Report is in substantial compliance with the court's order.  Plaintiff presents no valid grounds for reconsideration of the court's prior rulings on this matter.

## VI.  PLAINTIFF'S MOTION IN OPPOSITION TO DISMISSAL OF CCS

This pleading is simply Mr. Green's motion for reconsideration of the court's prior order granting the motion to dismiss of defendant CCS and dismissing this lawsuit as against defendant CCS.  In determining this motion, the court has also considered the Response of CCS to Plaintiff's Motion Opposing the Dismissal of CCS as a Defendant (Doc. 72).  CCS responds that plaintiff has "merely set forth the same arguments/statements" he previously pled and has not established any grounds for relief from judgment.

This motion is not construed as one to alter or amend a

judgment under Rule 59(e) of the Federal Rules of Civil Procedure or as a motion for relief from final judgment under Rule 60(b) because no final judgment has been entered in this case. Nor is it construed as a motion seeking reconsideration under District of Kansas Rule 7.3(b) because that rule only applies to non-dispositive orders, and the court's order dismissing CCS was dispositive. While, neither the Federal Rules of Civil Procedure nor this court's local rules recognize a motion for reconsideration to challenge a dispositive order, it is within the court's discretion to revise an interlocutory order at any time prior to the entry of final judgment. Ferluga v. Eichoff, 236 F.R.D. 546, 548-59 (D.Kan. 2006). Consequently, this motion is considered based upon the court's inherent power to review its interlocutory orders. The legal standards applicable to a Rule 59(e) motion and/or a motion to reconsider a non-dispositive order under D. Kan. Rule 7.3 are essentially identical and are applied to this motion.

A motion seeking reconsideration "shall be based on (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3(b); see also Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)(stating these same three grounds for a Rule 59(e) motion). Relief under Rule 59(e) is "extraordinary and may be granted only in exceptional circumstances." Allender v. Raytheon Aircraft Co., 439 F.3d 1236, 1242 (10th Cir. 2006); Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., 909 F.2d 1437, 1440 (10th Cir. 1990). Rule 59(e) does not permit a losing party to rehash or restate arguments previously addressed or to present new legal theories or supporting

facts that could have been included in plaintiff's earlier filings. Wilkins v. Packerware Corp., 238 F.R.D. 256, 263 (D.Kan. 2006), aff'd 260 Fed.Appx. 98 (10th Cir. 2008)(citing Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1332 (10th Cir. 1996); Servants, 204 F.3d at 1012.  The party seeking relief from a judgment bears the burden of demonstrating that he satisfies the prerequisites for such relief.  Van Skiver v. U.S., 952 F.2d 1241, 1243-44 (10th Cir. 1991), cert. denied, 506 U.S. 828 (1992).

Mr. Green has not alleged an intervening change in the law, presented new evidence as the basis for this motion, or shown a need to correct clear error.  His mere restatement of his claims and disagreement with the findings and rulings of the court fail to demonstrate the existence of any extraordinary circumstances that would justify alteration of the court's ruling.


**VII.  CONCLUSION AND ORDER**

For all the foregoing reasons, the court concludes that defendant Lawhorn is entitled to summary judgment, and that this action must be dismissed for failure  to state a constitutional claim of denial of medical treatment.

**IT IS THEREFORE BY THE COURT ORDERED** that defendant Lawhorn's Motion for Summary Judgment (Doc. 61) is sustained and this action is dismissed with prejudice and all relief is denied as against Dr. Lawhorn.

**IT IS FURTHER ORDERED** that plaintiff's Motion in Opposition to the Dismissal of CCS (Doc. 69) is construed as a Motion for Reconsideration and denied.

47

**IT IS FURTHER ORDERED** that this action is dismissed, without prejudice, as against defendant Satchell because he was not timely served and for failure to state a claim against Dr. Satchell.

**IT IS FURTHER ORDERED** that plaintiff's third Motion for defendants to comply with court order (Doc. 70), and plaintiff's Motion to Appoint Counsel (Doc. 74) are denied.

**IT IS SO ORDERED.**

Dated this 8th day of March, 2012, at Topeka, Kansas.

s/Sam A. Crow
U. S. Senior District Judge